ENRON OIL TRADING AND TRANSPORTATION CO., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 87–09–00934

(Decided September 27, 1991)

*Herbert Peter Larsen,* for plaintiff.
*Stuart M. Gerson,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, United States Department of Justice, (*Bruce N. Stratvert*) for defendant.

## BACKGROUND

MUSGRAVE, *Judge*: Plaintiff, Enron Oil Trading & Transportation Co. ("Enron" herein) is the successor in interest to P & O Falco Inc. ("Falco"), the importer of record of four entries of petroleum products imported in 1984. Each entry was made under TSUS item 475.65 as "Hydrocarbon mixtures, not specially provided for, derived wholly from petroleum * * * which contain by weight not over 50 percent of a single hydrocarbon compound: In liquid form," at the duty rate of 0.25 cents per gallon. In 1986, the Customs Service issued notices of liquidation of the four entries showing dates of liquidation approximately two years after the respective entry dates. Liquidation for each entry was under TSUS item 475.25 as "Motor Fuel" at a duty rate of 1.25 cents per gallon.

Plaintiff contends that it did not receive any notice of extension of the time for liquidation and that the entries were therefore liquidated by operation of law pursuant to 19 U.S.C. § 1504 (1980).[1] Defendant asserts that notices were mailed to Falco, that Falco is deemed to have received them, and that the mailed notices are merely courtesy notices, whereas formal notices were affixed to the customhouse bulletin board. Both parties have moved for summary judgment.

## STANDARD OF REVIEW

Entries of merchandise not liquidated within one year are deemed liquidated at the rates asserted at the time of entry. 19 U.S.C. § 1504(a). Customs may extend the period in which to liquidate an entry "by giving

---

[1] 19 U.S.C. § 1504 was amended in 1984 by public law 98–573 § 191(d). The amendments apply only to articles entered on or after October 30, 1984. Pub. L. No. 98–573 § 195(a) (1984). The latest date of entry at issue in this case is May 7, 1984. The 1984 amendments thus do not apply in this case.

notice to the importer, his consignee, or agent in such form and manner as the Secretary shall prescribe in regulations." 19 U.S.C. § 1504(b). The relevant regulation in turn provides for notice to "the importer or the consignee and his agent and surety on Customs Form 4333–A, appropriately modified, that the time has been extended and the reasons for doing so." 19 C.F.R. § 159.12(b) (1991). Since the extension is made "by giving notice," in the absence of such notice, liquidation occurs by operation of law. *See Pagoda Trading Co. v. United States*, 9 CIT 407, 411, 617 F. Supp. 96, 99 (1986); *aff'd*, 84 F.2d 665 (Fed. Cir. 1986).

Defendant argues that the notice required by the statute is accomplished through posting Customs Form 4333 at the customhouse, and that the mailed notice on form 4333–A is merely a courtesy notice. This argument is to no avail, as defendant nowhere states that notice on Form 4333 was in fact posted. Moreover, the plain language of the regulation refutes this contention. In contrast with 19 C.F.R. § 159.9 (1991) which governs notices of liquidation and expressly states that Customs "will endeavor" to provide importers with "courtesy notice" that shall not serve as formal notice, the language of 19 C.F.R. § 159.12(b) is mandatory and without qualification. Form 4333–A notice was not provided to plaintiffs in any manner other than through Customs' regular practice of mailing. The question is thus whether Customs' regular practice of mailing was accomplished and accomplished its task in this case.

Defendant rises two related presumptions on this point. First, to establish mailing, defendant relies upon the presumption that government officials perform their duties in the manner required by law. *E.g., Star Sales & Distributing Corp. v. United States*, 10 CIT 709, 710, 663 F. Supp. 1127, 1129 (1986). Second, proof of mailing raises a presumption of delivery. *F.W. Myers & Co. v. United States*, 6 CIT 215, 216, 574 F. Supp. 1064, 1065 (1983). The presumptions are not conclusive: "[A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of risk of nonpersuasion, which remains * * * upon the party on whom it was originally set." Fed. R. Evid. 301.

When notice must be given by the Customs Service, the burden of going forward with evidence initially falls upon the plaintiff due to the presumption of regularity attaching to official acts, but the burden of proof remains on the government because it is the government's responsibility to provide the notice. *Intra-Mar Shipping Corp. v. United States*, 66 Cust. Ct. 3, 6 (1971). When the plaintiff has met the initial requirement of negating the presumed delivery by evidence of non-receipt, non-issuance or non-delivey of the notice, the burden falls upon the government to establish that notice was given. *Intra-Mar*, at 6.

## SUMMARY JUDGMENT

Both parties have moved for summary judgment. Summary judgment can be entered only if the pleadings and other documents on file show that there is no genuine issue of material fact and that the moving party

is entitled to a judgment as a matter of law. Rule 56(d), Rules of the Court of International Trade. The party seeking summary judgment must demonstrate that there is no dispute as to any material fact in the case. *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences to be drawn from these facts. *Warrior Tombigbee*, at 1296. Although the parties do not dispute the majority of circumstances in this case, the facts which may be inferred from those circumstances remain at issue.

### EVIDENCE

Plaintiff submits the affidavit of Mr. Jeff Anthony Harbert. The affidavit states as follows: Mr. Harbert has worked for Falco and its successor Enron continuously for the past nine years. During the times relevant to this case, it was the regular business practice of both Enron and Falco to forward any documents received from the Customs Service to Mr. Harbert's office. He maintained a file for each product contract in this case, and it was his regular practice to lodge all of the documents that he received pertaining to a particular importation in the appropriate contract file. He has searched these files and found no trace of any notice of liquidation of the four entries at issue. He has no recollection of ever receiving or viewing any notice of extension, and believes that neither Falco nor Enron ever received such notices.

Plaintiff also submits the affidavit of its attorney in this case, Mr. Herbert Peter Larsen. Mr. Larsen states that he has personally ascertained that diligent searches of the relevant files in the offices of the surety for the entries, Commercial Union Insurance Companies, have been undertaken and that no notices of extension or liquidation nor any records of receipt of such notices have been found. He does not state how he has ascertained this information.

The government submits the affidavits of Customs Service employees with expertise in the operation of Customs' Automated Commercial System ("ACS"), a computer system which tracks and processes all Customs entries. Customs extends the time for liquidation by recording the extension information onto ACS, which then automatically prints the notices. Hines Declaration ("H.D.") at 1. They are printed and processed on weekends, and separated and stacked in trays for pickup by the U.S. Postal Service. Fouch Declaration ("F.D.") at 3. With respect to possible malfunctions, the employee who supervised printing of notices stated, *"If,* for example, an operator *notices* that the printer is not operating properly or that the notices have been bent or torn, the processing *may* be stopped and the damaged notices *can* be reprinted." F.D. at 3.[2] Approximately 28,000 extension and suspension notices are printed weekly. F.D. at 1. In part due to the volume printed, Customs does not

---

[2]Emphasis added.

maintain paper copies of extension notices, but stores information relating to notices in a computerized history file. H.D. at 2.

Accompanying these employee affidavits, the government submits a computer printout of the records from the history file corresponding to the notices at issue. Exhibit A to Defendant's Brief in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment, ("C.P.") In all, records of fourteen notices (seven for Falco and seven for the surety) are shown as printed on five different days. C.P.; H.D. at 4–5. The printout lists the name and address for the addressee of each notice, and has columns labeled "EXT/ SUSP CODE," "MAIL CYCLE," and "RUN DATE," in addition to columns stating the entry number and other information for each notice. C.P. Customs' computer programmer stated that a "1" in the "EXT/ SUSP CODE" column indicates that the liquidation of the entry has been suspended because additional time is needed to process the entry. H.D. at 3–4. Each record had a "1" in the "EXT/SUSP CODE" column. C.P.

The "MAIL CYCLE" and "RUN DATE" columns on this printout contain defendant's sole evidence in support of timely notification under 19 U.S.C. § 1504(b). The "MAIL CYCLE" column contains a code which identifies the year and weekly mail cycle in which the corresponding notice was printed. H.D. at 4. The "RUN DATE" column contains the actual date that the notice was printed. The record for the notice of the first extension of liquidation of each entry at issue has a code in the "MAIL CYCLE" column identifying a weekly cycle less than one year from the date of entry. H.D. at 4. All of the notices of the first extension for Falco were printed in one mail cycle; those for the surety, in the next. C.P. However, the Customs Service did not begin recording the actual dates that notices were printed until after the dates corresponding to the mail cycles shown for the notices of the first extensions. H.D. at 4. The "RUN DATE" column for each notice of the first extension thus contains "00/00/00." C.P. The notices of the second extensions were generated after Customs began recording the actual date of printing and show dates less than two years after the date of entry in the "RUN DATE" column and "000" in the "MAIL CYCLE" column.

The records for the notices of the first extensions differ from those of the second extensions in other ways. The entry numbers listed for the notices of the first extensions do not show the last digit. For example, the record of the notice of the first extension of entry number 84–342954–7 shows the entry number as "0342954," while the record of the notice of the second extension shows the entry number as "3429547." C.P. Similarly, extra zeroes appear in the importer number and zip codes in the records of the second extension notices but do not in the earlier records.

The government also submits the affidavit of an import specialist responsible for petroleum products. Cox Declaration ("C.D.") While he does not recall the specific entries in question, he was responsible for pe-

troleum product entries at the ports and times in question. C.D. at 2. He stated that he regularly received a report of entries which remained unliquidated after nine months, and would determine if more information were required and whether the time to liquidate those entries should be extended. C.D. at 2. When he made a determination to extend the time to liquidate an entry, he would direct that the appropriate data be entered into the Customs computer system. C.D. at 2. Without such action, no extension or notice could issue. C.D. at 2.

Customs laboratory reports for each of the entries are also before the Court. Exhibit A to Defendant's Reply Brief In Support of its Cross-Motion for Summary Judgment ("L.R."). These reports are dated approximately three months after the mail cycles identified in the history file for the notices of the first extension, and approximately eleven months before the run date of the notices of the second extension. L.R., C.P. Each of these identifies the subject merchandise as gasoline, and only one refers to a request for additional information.

### ANALYSIS

Initially, the Court notes that 19 U.S.C. § 1504 is a direct mandate to Customs to act within a specific time or adequately extend that time, and is designed for the benefit of importers. *Pagoda*, 9 CIT at 411, 617 F. Supp. at 99. The intent of the statute is to relieve importers of prolonged uncertainty and to conform with international expectations interpreted to require that duty liabilities should be ascertained and fixed generally within a year after entry. *Ambassador Division of Florsheim Shoe v. United States*, 748 F.2d 1560, 1565 (Fed. Cir. 1984). The mechanized mailing of ten of thousands of notices of extensions each week would seem to flout both the letter and spirit of the statute.

Despite the parties' assurances to the contrary, an issue of material fact remains: whether notice was mailed to Falco. Plaintiff's affidavit from Mr. Harbert is sufficient to rebut the presumption that notice given. *Cf. Myers*, 6 CIT at 217, 574 F. Supp. at 1066. This issue requires the Court to weigh the evidence before it, therefore plaintiff's motion for summary judgment and defendant's cross motion for summary judgment are denied.

The government had the burden of establishing that notice was given to plaintiffs. The affidavits and admissions before the Court do not establish the fact. During oral argument, defendant declined the opportunity to present additional evidence on this question and indicated that it had nothing to add to the affidavits now before the Court. Tr. at 21. Accordingly, the Court will proceed on the record before it. Rule 56(e), Rules of the Court of International Trade.

No individual stated directly that the notices were printed or mailed, which is not surprising given the huge volume of notices processed weekly by Customs. The government also produced no tangible evidence on this point, as a result of its understandable adoption of a paperless record-keeping system. However, it is evident from the computer

printout furnished by Customs that changes in the operation of this paperless system took place between the processing of the first and second extensions. The "MAIL CYCLE" code identifying the dates for printing the first extension notices was apparently generated before printing, and no date of actual printing is included in the records for those notices. Thus it is not clear if the "MAIL CYCLE" code verifies that the notices of the first extension were actually printed during that mail cycle, or were simply scheduled for printing. Moreover, the assurances of quality control given in the affidavits do not inspire unshakable faith in the regularity of the printing process — "if an operator notices [a problem] * * * notices can be reprinted." F.D. at 3. Nowhere is it stated that operators are even present at each machine.

It is also not apparent why Customs needed extensions of time to liquidate these entries. No record is kept of the reasons for the extensions other than the fact that more time was required. The laboratory reports indicate that Customs had identified the merchandise as motor fuel months before the second extension was made. If additional information was required, what information and why it was needed remains unknown.

Plaintiff's evidence of non-receipt by Falco (the importer of record) is simple and clear, although circumstantial. The evidence of non-receipt by the surety is less firm, coming as it does from an affiant who gives no indication of his competence except that he "personally ascertained" that no record of notice existed in the surety's files. However, plaintiff need only establish that no notice was given the "importer, his consignee, or agent". 19 U.S.C. § 1504. Evidence of non-receipt by the surety merely adds some support to that inference.

The Court concludes that Customs has failed to meet its burden of proving notice as against plaintiff's proof of non-receipt. Therefore, the entries were liquidated by operation of law one year from their respective dates of entry. 19 U.S.C. § 1504. No protest or voluntary reliquidation was made within the ninety days allowed by statute, 19 U.S.C. §§ 1501, 1514(c)(1) (1991), nor was reliquidation pursuant to 19 U.S.C. 1520 (1991) (Refunds and errors) made within one year, and no allegations of fraud appear. 19 U.S.C. § 1521 (1991) (Reliquidation on account of fraud). The liquidations at the rates asserted at entry are conclusive upon all parties and Customs' subsequent attempts at liquidation are invalid. 19 U.S.C. § 1514.

The Court determines that although the attempted reliquidations by Customs were invalid, plaintiff's protests were valid, filed as they were within 90 days after notice of liquidation. 19 U.S.C. § 1514(c)(2)(A); *Pagoda*, 804 F.2d at 667; *See also Detroit Zoological Society v. United States*, 10 CIT 133, 630 F. Supp. 1350, 1355, n.7 (1986). This action contests the denial of those protests, and jurisdiction is thus proper under 19 U.S.C. 1581(a) (1991).

Accordingly, Customs is directed to assess duties as proposed on entry, and to refund any excess monies collected to plaintiff, with interest as allowed by 19 U.S.C. § 1520 on any such excess collected as increased or additional duties pursuant to the invalid liquidations.